Harry TELFAIR, Plaintiff,

v.

Thomas GILBERG, and Oscar
Gaines, Defendants.

Civ. A. No. 493–310.

United States District Court,
S.D. Georgia,
Savannah Division.

Oct. 24, 1994.

Harry Telfair, pro se.

Emily Elizabeth Garrard, Thomas J. Mahoney, Jr., Savannah, GA, for defendants Thomas Gilberg, Sgt., and Oscar Gaines.

## *ORDER*

EDENFIELD, Chief Judge.

After a careful *de novo* review of the record in this case, the Court **REJECTS** the Report and Recommendation of the Magistrate on Defendant Gilberg's motion for summary judgment, to which objections have been filed. The Court agrees with the Magistrate's conclusion, but arrives there via

slightly different reasoning. The Court disposes of Defendant's motion as if it had been originally lodged with this Court. The motion for summary judgment is **DENIED** in part and **GRANTED** in part.

## I. INTRODUCTION

Plaintiff Telfair brought these claims under state law and 42 U.S.C. § 1983 (1990), alleging that Defendant Gilberg assaulted him and used excessive force in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Because we find that the factual circumstances, read in a light most favorable to Telfair, may establish valid claims of assault or unconstitutional treatment under the Fourteenth Amendment, the Court denies Gilberg's motion for summary judgment in his individual capacity. The motion is granted only to dispose of any claims Telfair may have against Gilberg in his official capacity.

## II. SUMMARY JUDGMENT STANDARD

■ The purpose of summary judgment is to explore the available evidence to determine whether there is a genuine issue of material fact requiring a trial. *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is granted when no such issue is discovered and the Court finds the movant entitled to judgment as a matter of law. *Great Lakes Dredge & Dock Co. v. Miller,* 957 F.2d 1575, 1578 (11th Cir. 1992), *cert. denied, Chevron Transport Corp. v. Great Lakes Dredge & Dock Co.,* — U.S. ——, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate only when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. *See Tidmore Oil Co. v. BP Oil Co.,* 932 F.2d 1384, 1387–88 (11th Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991).

■ After the movant successfully discharges his initial burden of demonstrating an absence of material issues of fact, *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53, the burden shifts to the nonmovant to establish, by going beyond the pleadings, that there indeed exists an issue material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Andersen v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmovant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Id.* at 257, 106 S.Ct. at 2514–15. If the nonmovant's response to the summary judgment motion consists of nothing more than conclusory allegations, the Court must enter summary judgment for the movant. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). The minimum showing is of "specific facts showing that there is a genuine need for trial," *Johns v. Jarrard,* 927 F.2d 551, 555 (11th Cir.1991), *reh'g denied,* 935 F.2d 1297 (citation omitted); the nonmovant may not rely solely on the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Where the parties' factual statements conflict or inferences are required, the Court will construe the facts in a light most favorable to the nonmovant. *Barnes v. Southwest Forest Industries,* 814 F.2d 607, 609 (11th Cir.1987).

■ A proper summary judgment motion may be opposed with any of the evidentiary materials listed in Fed.R.Civ.Proc. 56(c). The Court may consider pleadings, "depositions, answers to interrogatories, admissions on file, affidavits, oral testimony, matters subject to judicial notice, stipulations and concessions, and other materials admissible in evidence or otherwise usable at trial." *Clay v. Equifax, Inc.,* 762 F.2d 952, 956 (11th Cir.1985); Fed.R.Civ.Proc. 56(c). In assessing the evidence before it, the Court must avoid weighing conflicting evidence, *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14, or making credibility determinations. *Id.*; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). A

mere "scintilla" of evidence, however, will not suffice to support the nonmovant's position. *See, e.g., Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

### III. FACTS

Plaintiff Harry Telfair was admitted to the Chatham County Jail on approximately June 15, 1992, after his arrest for the sale of crack cocaine. At all times relevant to this case, Plaintiff Telfair had not been convicted of any crime; he was a pretrial detainee.

On the morning of October 5, 1992, Telfair did not receive a breakfast tray, apparently due to a miscount in the kitchen. He complained to the night shift staff, but the message did not reach the kitchen until it had closed. Both the night staff and Officer Brian Saxon offered him a bag lunch instead, but Telfair refused, stating that he wanted what everyone else had for breakfast. Telfair asked to see Officer Saxon's supervisor, Defendant Thomas Gilberg, but was informed that the supervisor was "busy" and would not come to Telfair's dorm.

At approximately 8:00 am, Telfair entered the vestibule just outside of his dorm, Pod 3–C, and sat on a trash can. He was asked to return to the dorm, but would not, stating that the other inmates had eaten while he had not. Telfair was aware that inmates were not allowed in the vestibule unless ordered to be there. The inmate was once again offered a bag lunch, but once again he refused, explaining that the lunch did not provide as much to eat as the others had received. Officer Saxon contacted the kitchen supervisor about getting more food for Telfair, but was informed that—for some reason—no more than one bag lunch could be provided. Officer Saxon then notified Gilberg, who instructed Saxon to take Telfair to see a counselor. The inmate willingly went along. However, despite the importunations of four counselors, Telfair would not budge, observing that the night staff, which had made a mistake with the breakfast trays, was at fault, not him. When told that further refusal would result in him being taken to "lockdown," Telfair agreed to go to lockdown willingly if Officer Saxon so ordered, but not to the dorm.

Officer Saxon, declining to bring Telfair to lockdown, returned Telfair to the vestibule and once again asked him to return to his dorm. He refused. Saxon, exasperated, told Telfair to wait in the vestibule while he got his "supervisor or someone to come to 3–C and take care of this problem." Saxon then once again contacted Defendant Gilberg.

At about 10:00 am Nurse Sharon Morgan entered the vestibule to distribute morning medications—Pod 3–C is a "medical dorm" housing inmates with significant medical conditions. She informed Telfair that she was not allowed to dispense them with him present, but Telfair only recounted his tale to the nurse, noted that Officer Saxon had told him to wait there, and refused to move. Nurse Morgan left the vestibule without dispensing any medicine, and discussed the matter with Officer Saxon, who had just returned with Gilberg. Gilberg asked Telfair to come into the hallway, which he declined to do. Telfair explained his story to Gilberg, who replied that Telfair could file a grievance if he wished, but first must return to his dorm. The inmate disagreed, saying that no formal grievance was needed: the staff had made the mistake, and it was a simple matter for them to correct it. He then told Gilberg that he would go wherever else the officers wished, but would not return to the dorm, since the inmates there had eaten while he had not.

Officer Gilberg then asked Nurse Morgan about Telfair's medical condition—Telfair had suffered injuries in a car accident in 1985 and now had a prosthetic hip. Gilberg asked the nurse if the condition prevented him from "moving" Telfair, and was told that it did not. Gilberg then entered the vestibule with Defendant Oscar Gaines, the escort officer. They walked up to the Telfair, who was still seated on the trash can. Telfair contends the following then occurred: Gilberg grabbed his left shoulder and said "Let's go." Telfair pulled away from Gilberg, prompting Gilberg to grab him by the throat and choke him. Gilberg slammed Telfair against the wall behind the trash can and used his hold on Telfair's neck to force him to his feet. Telfair did not resist in any way. Gilberg then grabbed Telfair's left arm and forced

him into an arm hold, applying pressure in such a way that Telfair was bent over. Defendant Gaines then took his right arm, and the officers led him to lockdown in Pod 3–H. In a hallway near 3–H, Telfair claims that Ricky Mikel, another jail official, asked Gilberg what he was doing. Gilberg then released Telfair and told him to face the wall. Mikel asked Gilberg why he was treating Telfair so roughly in light of Telfair's medical condition, and told Gilberg to place restraints on the inmate instead. Gilberg then returned, forced Telfair's left arm up behind his back, and applied wrist restraints. Telfair did not resist. The officers then escorted him to a lockdown cell and asked him to sit down on the bunk. Telfair, apparently prevented by his prosthetic hip from sitting down unassisted, asked Gilberg how he could possibly comply. Gilberg then said "Oh, you can't sit down," and pushed the inmate over, causing him to hit his hip on the metal frame of the bunk. The officers then lifted Telfair off of the floor by his arms and sat him on the bunk. Gilberg then told him that "he was going to learn to do as he's told" while at the Jail, removed the restraints, and left with Officers Gaines and Saxon.

In contrast, Officer Gilberg contends that when he placed his hand on Telfair's left shoulder while in the vestibule, Telfair pushed it away, told Gilberg to keep his hands off of him, and then slapped Gilberg. Gilberg, Gaines, and Saxon then "attempted to gain control by moving Plaintiff back against the vestibule bars." Gilberg states that he then grasped the front of Telfair's shirt—not his throat—and lifted him to his feet. Gilberg then applied an arm hold and escorted Telfair to lockdown, where Telfair slapped Gilberg's arm as the officer attempted to apply wrist restraints. Gilberg makes no mention of Ricky Mikel, stating that the restraints were applied so that he could secure a cell for the inmate. Once inside the cell, Telfair ignored two requests to sit down, prompting the officers to lift him in a "fireman's carry" and seat him on the bunk. The restraints were removed and the officers left.

The morning after the incident, Telfair was examined by Dr. Gary Harvey, who found that Telfair's hip was bruised and swollen,

but otherwise unhurt. X-rays were taken, but revealed no serious injuries. Telfair showed no signs of having been choked. He received pain medication for his hip bruises and was returned to his dorm.

## IV. ANALYSIS

### A. Officer Gaines

Our first finding is that Officer Gaines has no place in this suit. Telfair stipulates, at ¶ 39 of his Statement of Material Facts, that "Oscar Gaines did not use excessive force against Plaintiff," and the Court independently has found no evidence linking Officer Gaines to Telfair's claims. This suit is clearly aimed at Officer Gilberg; the claims against Gaines have been abandoned and are hereby dismissed.

### B. Assessing the Evidence

Gilberg filed nine affidavits with his motion for summary judgment, from every person related to the incident in question. Telfair filed none. Fed.R.Civ.Proc. 56(e) states that

When a motion for summary judgment is made and supported [with affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Because of Telfair's pro se status, the Court is not as swayed by the relative imbalance in evidentiary support as it otherwise might be. While Gilberg's affidavits are significant evidence, the Court is unprepared to dismiss Telfair's claims out of hand. As further explored below, if read even moderately in Telfair's favor, the record is sufficient to establish a violation of applicable constitutional standards.

### C. Qualified Immunity

■ Gilberg first raises the defense of qualified immunity. The doctrine of qualified immunity shields public officials from civil liability when they are exercising discretion-

ary responsibilities and their conduct "does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). Immunity is the rule, not the exception. *Id.; Lassiter v. Alabama A & M,* 28 F.3d 1146, 1149–1151 (11th Cir.1994) (en banc).

■ Once a public official raises a qualified immunity defense, the plaintiff has the burden of proving that the official's conduct violated clearly established statutory or constitutional rights. *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir.1989).

> For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law.

*Lassiter,* 28 F.3d at 1149 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Once the qualified immunity defense has been raised, *Lassiter* reminds lower courts that they must not permit plaintiffs to discharge their burden of showing that the relevant law was "clearly established" by merely "referring to general rules and to the violation of abstract 'rights.'" 28 F.3d at 1150.[1] The decision quotes with approval another recent Eleventh Circuit opinion:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar.... *Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.*

*Id.* (emphasis in original) (quoting *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1573, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d

923 (11th Cir.1993)). For qualified immunity to be lost, pre-existing law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Lassiter,* 28 F.3d at 1151 (emphasis in original).

■ It is not disputed that Gilberg was acting as a prison guard, *see Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir. 1991), and was vested with discretion and empowered to exercise judgment in matters before him. *See Sammons v. Taylor,* 967 F.2d 1533, 1539 (11th Cir.1992). The burden then shifts to Telfair to show that Gilberg crossed a "bright line" in the law. *Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).

■ There is little doubt that, for our purposes, the law in this area is "clearly-established," whichever legal standard is ultimately appropriate. Under the Eighth Amendment standard, a convict has a right to be free from the use of excessive force, force which is applied "maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). Under the Fourteenth Amendment, the pretrial detainee has a right to be free from conditions or deprivations that are wanton, arbitrary, or intended to punish. *Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447 (1978). Both standards are clear enough to hold state officials accountable to them; it requires little creativity or imagination for a reasonable jail official to guess that choking a physically handicapped detainee and knocking him over might constitute a constitutional violation. Factual scenarios from prior cases would provide sufficient warning. *See, e.g., Popham v. Kennesaw,* 820 F.2d 1570, 1573 (11th Cir.1987); *Hewett v. Jarrard,* 786 F.2d 1080, 1085 (11th Cir.1986).

---

1. The distinction here is actually one that was made in *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738: the difference between *"currently applicable"* law, meaning the standards applicable in

appropriate scenarios, and *"clearly established"* law, meaning actual cases establishing that a particular scenario indeed violates the relevant legal standard.

Telfair has shown sufficient facts in this case to potentially prove a claim under either standard above. While the available evidence is not overwhelming, there is enough to support Telfair's contention that Gilberg, at the minimum, arbitrarily shoved a disabled man to the floor of a prison cell. Telfair's bruises attest to that claim, as well as Telfair's own deposition testimony. This evidence is at odds with Gilberg's version of the facts. There is thus a material issue as to whether Gilberg's conduct violated the clearly established law, and his qualified immunity defense must fail at this time.

### D. Official Immunity

#### 1. The State Law Claim

The Court considers Telfair's state law claim along similar lines. Telfair alleges that Gilberg assaulted him in violation of state tort law, and seeks money damages. See O.C.G.A. § 51–1–13 (1994). Gilberg has invoked the defense of official immunity under Georgia law, which shields state officials performing discretionary functions within the scope of their authority from tort liability unless the official acts with actual malice. *Hennessy v. Webb*, 245 Ga. 329, 330, 264 S.E.2d 878 (1980). As mentioned, there is no doubt Gilberg was performing a discretionary function within the scope of his official duties. Consequently, Telfair is required to show that the officer's conduct was willfully "malicious or corrupt," else Gilberg is immune from this state law claim. *Id.* at 331, 264 S.E.2d 878. See also *Alford v. Osei–Kwasi*, 203 Ga.App. 716, 721, 418 S.E.2d 79 (1992), *cert. denied*, (June 10, 1992). The available evidence here generates the same factual issues as those reviewed above; the record is insufficiently clear to grant summary judgment on this ground.

#### 2. The § 1983 Claim

Finally, although it seems unlikely from the pleadings, Telfair may also seek damages from Gilberg in his official capacity—essentially a claim against Chatham County itself. *Lassiter v. Ala. A & M Univ.*, 3 F.3d 1482, 1485 (11th Cir.1993) ("Official capacity actions seeking damages are deemed to be against the entity of which the officer is an agent."). The Court addresses the issue for the sake of thoroughness.

Here Telfair cannot prevail. Chatham County might be liable under 42 U.S.C. § 1983 if it instituted or tacitly approved a policy that violated constitutional rights, *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), but liability could not be imposed against the County simply because one of its officers unduly punished an inmate on an isolated occasion. Recovery is possible only where the municipality "has officially sanctioned or ordered the acts in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). Telfair has not alleged that a County policy underlay Gilberg's behavior. A single constitutional violation by a low-level County employee cannot by itself establish a municipal policy or custom sufficient to impose government liability under § 1983. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985). Even under a set of facts most favorable to Telfair, the County is immune from suit.

### E. "Excessive Force"

#### 1. The Proper Constitutional Framework

Having survived Gilberg's qualified immunity defense, the Court now turns to the substance of Telfair's § 1983 claim of excessive force. It is significant to the Court's analysis that, since Telfair was a pretrial detainee at the time of the incident, his § 1983 action is properly brought under the Fourteenth Amendment, not the Eighth. See *Ingraham v. Wright*, 430 U.S. 651, 671–72, n. 40, 97 S.Ct. 1401, 1412–13, n. 40, 51 L.Ed.2d 711 (1977):

> Eighth Amendment scrutiny is appropriate only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions. See *United States v. Lovett*, 328 U.S. 303, 317–18 [66 S.Ct. 1073, 1079–80, 90 L.Ed. 1252] (1946).... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. When the State seeks to impose punishment

without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*See also Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986) (citing *Ingraham* ). The Eighth Amendment simply does not apply to Telfair, and .it is here that the Court begins to differ with the conclusions of the Magistrate. The proper rubric for analyzing Telfair's claim is to decide whether Gilberg's actions constitute "punishment" of a pretrial detainee, from which unconvicted individuals are protected under the Due Process Clause of the Fourteenth Amendment. The "punishment" standard is articulated in *Bell v. Wolfish,* 441 U.S. at 535, 99 S.Ct. at 1871–72, and is discussed later in this order. *See infra* part V.C.1.c.

▮ The Court is aware that "states may not impose on pretrial detainees conditions that would violate a convicted prisoner's Eighth Amendment rights," *Hamm v. De-Kalb County,* 774 F.2d 1567, 1573–74 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), but this injunction does not mean that Eighth Amendment caselaw is used to reach the correct result in this case. It would indeed be illogical for the Due Process Clause to protect still-innocent detainees less than the Cruel and Unusual Punishment Clause protects convicts, *City of Revere v. Mass. Gen. Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), *Aldridge v. Montgomery,* 753 F.2d 970, 972 (11th Cir. 1985), but the corollary to that conclusion is not that Eighth Amendment jurisprudence governs disposition of Fourteenth Amendment cases.

There are some important observations to be made. The Court's analysis is unusually extensive, in response to the lack of caselaw in this circuit exploring excessive force standards under the Fourteenth Amendment.

**a. The Pedigree of the Current Standard**

The tendency in this circuit to apply Eighth Amendment standards to Fourteenth Amendment cases originates with Judge Henry J. Friendly of the Second Circuit Court of Appeals. In *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied, Employee–Officer John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), Judge Friendly dealt with a civil rights action under § 1983 by a pretrial detainee against a guard who had allegedly beaten him. Finding that the claim did not "lie comfortably within the Eighth Amendment," *id.* at 1031, Friendly solved the difficulty by reference to the Fourteenth: he found that *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a seminal substantive due process case, "must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." *Id.* at 1032. Judge Friendly then wished to extend that principle to "acts of brutality by correctional officers," *id.* at 1033, against pretrial detainees. He was, however, slowed by the necessity of strengthening the standard to meet or exceed that of the Eighth Amendment, citing the logical necessity of protecting the innocent at least as much as the convicted. *Id.* at 1032–33. This problem was solved by importing tort law principles,[2] and Friendly ended with a standard that could be applied to any claim of "undue force," whether occurring during arrest, pretrial detention, or post-trial incarceration:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033. The Supreme Court later quoted Friendly's standard with approval in

---

**2.** Much of Friendly's point was that violations which give rise to a substantive due process claim are necessarily more egregious than those

supporting a simple tort action. *See* 481 F.2d at 1033.

*Whitley,* 475 U.S. at 320–321, 106 S.Ct. at 1084–85—a prominent Eighth Amendment case—even though Friendly's efforts had been in the Fourteenth Amendment context.

*Whitley* made Friendly's language the essential Eighth Amendment excessive force test, and courts in this circuit and its predecessor [3] follow it in that and other situations. *See, e.g., Bennett v. Parker,* 898 F.2d 1530, 1533 (11th Cir.1990), *reh'g denied, en banc,* 916 F.2d 719 (1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991) (Eighth Amendment excessive force claim by convicted prisoner); *Hewett,* 786 F.2d 1080 (Fourteenth Amendment excessive force claim by juvenile detained pretrial); *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir. 1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986) (substantive due process claim by sister of arrestee who was shot by police); *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir., 1981) (substantive due process claim by man injured by police after photographing a police arrest); [4] *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981) (Four-

teenth Amendment excessive force claim by mother of pretrial detainee killed by jail guards after detainee became violent and guards attempted to subdue him); *Hamilton v. Chaffin,* 506 F.2d 904, 909 (5th Cir.1975) (Fourteenth Amendment excessive force claim by mother of arrestee who committed suicide while in custody). The most recent cases remain faithful to Friendly's product, but also reveal some confusion. For example, as the Magistrate was aware, the important *Hamm v. DeKalb County* decision equates the Eighth and Fourteenth Amendments in the context of pretrial detention, implying that lower courts should simply apply the Eighth Amendment standard in Fourteenth Amendment cases challenging conditions of pretrial confinement and indifference to medical needs. The holding in *Hamm,* however, is bound to its factual background—the case is not concerned with the use of force by prison guards, but with basic necessities during detention. Its reasoning is explicitly confined to that context:

> This court holds that *in regard to providing pretrial detainees with such basic necessities as food, living space, and medical*

---

**3.** The Eleventh Circuit, in the en banc decision *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**4.** *Shillingford v. Holmes* attempted to base Friendly's standard more firmly within *Rochin* by restating the requirements above and adding

> If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal, so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983.

634 F.2d at 265. Later cases omitted the "shocks the conscience" language, returning to a direct application of Friendly's analytical framework. *See e.g., O'Neal v. DeKalb County,* 850 F.2d 653, 656 (11th Cir.1988) (Fourteenth Amendment excessive force claim against officers who shot armed and violent hospital patient); *Gilmere,* 774 F.2d at 1500–01. This may be because the *Rochin* standard is actually more favorable to police and correctional officers than the "punishment" standard of *Bell v. Wolfish* or the Eighth Amendment "intent" standard of *Hudson v. McMillian,* 503 U.S. at ——, 112 S.Ct. at 999—it is simply a much more difficult stan-

dard for plaintiffs to meet. In *Rochin,* the phrase "shocks the conscience" does not tell the whole story: under that standard the official conduct in question should do more than "offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically." 342 U.S. at 172, 72 S.Ct. at 209. It must "offend even hardened sensibilities," *id.,* or be "brutal" and "offensive to human dignity." *Id.* at 174, 72 S.Ct. at 210. By definition, not many examples of official misconduct will raise this level. Judge Friendly implicitly admitted that the *Rochin* standard did not provide sufficient protection to pretrial detainees when he summarized it in *Johnson,* but then molded it into a stronger test for constitutional violations involving the use of force. *See* 481 F.2d at 1033.

An element of the *Rochin* decision infrequently noted by courts is Justice Frankfurter's warning that the "standards" articulated therein are not intended as a comprehensive expression of due process protections:

> [T]hese [due process] standards of justice are not authoritatively formulated anywhere as though they were specifics.... In dealing not with the machinery of government but with human rights, the absence of formal exactitude, or want of fixity of meaning, is not an unusual or even regrettable attribute of constitutional provisions.

342 U.S. at 169, 72 S.Ct. at 208.

*care* the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons. The court recognizes that the limitations imposed by the eighth amendment and the due process clause arise in different contexts. Nonetheless, *with respect to the provision of basic necessities to individuals in the state's custody,* the two provisions necessarily yield the same result.

*Hamm,* 774 F.2d at 1574 (citation omitted and emphasis added), at 1574–75 (discussing medical needs). *See also id.* at 1574 ("[W]ith respect to basic necessities of life, the fourteenth amendment rights of detainees can be defined by reference to the eighth amendment rights of convicted inmates."). This holding is motivated by (a) the difficulty of applying the *Bell v. Wolfish* "punishment" standard in the context of prison living conditions, 774 F.2d at 1573, and (b) the conclusion that it would be strange to require certain areas of a single prison to be more habitable than others; the entire enterprise would enmesh the courts "in the minutiae of prison operations." *Id.* (quoting *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.), *cert. granted,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970, *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981)). Even though these concerns do not exist in cases involving the use of "undue force," some decisions, including the Magistrate's report and recommendation, cite *Hamm* to support applying Eighth Amendment standards to pretrial excessive force claims.

*Hamm* has technically remained confined to its original parameters, but its silence on the issue of excessive force has also led some courts to follow its reasoning when reviewing claims about pretrial jail conditions and medical needs, but then, unlike the Magistrate's report, look back to *Bell v. Wolfish* to resolve pretrial excessive force claims. The result is the application of Eighth Amendment standards in the former contexts, and application of *Bell*'s "intent to punish" standard in the latter. This approach contradicts the fairly clear statement in *Hewett,* 786 F.2d at 1085, that Friendly's excessive force standard applies to *all* uses of force by state officers. In *Young v. City of Atlanta,* 631 F.Supp. 1498,

1504 (N.D.Ga.1986), the plaintiff detainee claimed that the use of wrist and ankle restraints constituted excessive force. The court granted summary judgment to the defendant officers under a *Bell v. Wolfish* "punishment" analysis, and then applied *Hamm* to the plaintiff's other claim of deliberate indifference to medical needs. *Cf. Belcher v. City of Foley,* 30 F.3d 1390 (11th Cir.1994) (first concluding that plaintiff's claim is best read as one for denial of medical care, and then applying *Hamm* as a consequence). In *Newsome v. Webster* the court observed:

> A due process analysis of an excessive force claim requires a showing, generally speaking, that the defendant intended with the challenged action to inflict punishment on the plaintiff. *See generally Bell v. Wolfish,* 441 U.S. 520, 535–39 [99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447.]

843 F.Supp. 1460, 1466 n. 6 (S.D.Ga.1994). The court then went on to apply *Hamm* to plaintiff's claim of denial of medical care. *Id.*

### b. The Current Standard and Excessive Force Claims Under the Fourteenth Amendment

No Eleventh Circuit cases seem to have explicitly applied Judge Friendly's reasoning and standard to situations involving the use of force on an adult pretrial detainee. The closest case is *Hewett,* where an intervening plaintiff—a juvenile detainee—brought a § 1983 action under the Fourteenth Amendment against the superintendent of a juvenile detention center. 786 F.2d 1080. The detainee claimed that the conditions of confinement violated his due process rights and that the superintendent had assaulted him, further violating those rights. Citing *Shillingford v. Holmes,* the court used Friendly's analytic framework "to determine when use of force by a state officer rises to a constitutional deprivation." *Id.* at 1085. The court further declared that Judge Friendly's observation that it would be improper to construe the Constitution to protect pretrial detainees less than convicted criminals was "the law in this circuit." *Id.*

If the Court so chose, application of Judge Friendly's standard to the use of force

**1408**

against pretrial detainees could be easily supported by available Eleventh Circuit precedent. This is especially so in light of the fact that Friendly's opinion itself dealt with that very scenario, and, as noted, courts within this circuit have applied his reasoning to situations ranging from police shootouts, *O'Neal v. DeKalb County*, 850 F.2d 653, 654–55 (11th Cir.1988), to convicted prisoner complaints, *Bennett*, 898 F.2d at 1530–31, to juvenile detainees, *Hewett*, 786 F.2d at 1085. Friendly intended for his original standard to fit all stages of official contact with private citizens; there was no reason to limit due process protection against police brutality only to conduct "violating the specific command of the Eighth Amendment." *Johnson*, 481 F.2d at 1032. The standard could properly encompass cases ranging from arrest to detainment and then imprisonment, or, put differently, cases covered by the Fourth, Fourteenth, and the Eighth Amendments. *Id. See, e.g., Gilmere*, 774 F.2d 1495 (reviewing plaintiff's § 1983 claim under both the Fourteenth and Fourth Amendments); *Shillingford*, 634 F.2d 263 (same).

 There are problems with this approach, however, that directly implicate current Eleventh Circuit caselaw. The Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) specifically rejects Friendly's creation of an excessive force standard for all seasons:

> In the years following *Johnson v. Glick*, the vast majority of lower federal courts have applied its four-part "substantive due process" test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under § 1983, without considering whether the particular application of force might implicate a more specific constitutional right governed by a different standard. . . .
>
> We reject this notion that all excessive force claims brought under § 1983 are governed by a single generic standard. . . . In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.

*Id.* 490 U.S. at 393–94, 109 S.Ct. at 1870–71. Thus, in cases involving an arrest, investigatory stop, or other "seizure" of a free citizen, the "reasonableness" standard of the Fourth Amendment must apply, *id.* at 395, 109 S.Ct. at 1871, *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); in cases involving convicted prisoners, the "excessive force" standard of the Eighth Amendment must apply, *Whitley*, 475 U.S. at 318–326, 106 S.Ct. at 1083–87, *Hudson*, 503 U.S. at ——, 112 S.Ct. at 999. In cases involving pretrial detainees, however, there is no more appropriate constitutional hook than the Fourteenth Amendment, *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10, *Ingraham*, 430 U.S. at 671–72, 97 S.Ct. at 1412–13, but the Supreme Court does not hint at the standard to be applied in those cases. At the minimum, though, *Graham* casts doubt on the "indiscriminate" use of Friendly's test to date. There apparently are specific standards to be used in each of the Fourth, Fourteenth, and Eighth Amendment contexts, and Friendly's four-part test—even though created in a Fourteenth Amendment case—remains the essential Eighth Amendment standard. *Hudson*, 503 U.S. at —— — ——, 112 S.Ct. at 999–1000. There is nothing to say that a new and specific Fourteenth Amendment standard is not appropriate.

### c. The Significance of Innocence

 The problem is determining what the standard should be. Initially the Court notes that while the Fourteenth Amendment rightfully grants no more protection to *convicted prisoners* than the Eighth, *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088, the Fourteenth Amendment standard for pretrial detainees logically should be higher, since those inmates are protected from any "punishment" by the state. Under the Eighth Amendment, "states may not impose punishments [on convicted prisoners] that shock the conscience, involve unnecessary and wanton infliction of pain, offend evolving notions of decency, or are grossly disproportionate to the offense for which they are imposed." *Hamm*, 774 F.2d at 1571 (citing *Newman v. Alabama*, 503 F.2d 1320, 1330 n. 14 (5th Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975)). *See Estelle v.*

*Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977); *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Under the Fourteenth Amendment, however, states may not "punish" pretrial detainees *at all.* *See Bell,* 441 U.S. at 535, 99 S.Ct. at 1871–72; *Jones,* 636 F.2d at 1368. But since that famous observation that "it would be absurd to hold that a pretrial detainee has less constitutional protection against acts of prison guards than one who has been convicted," *Johnson,* 481 F.2d at 1032, courts have applied the *same* standard to both pretrial detainees and convicted prisoners. *See, e.g., Thompson v. County of Medina,* 29 F.3d 238, 242 (6th Cir.1994); *Valencia v. Wiggins,* 981 F.2d 1440, 1445–46 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993).

■ There is a certain administrative neatness about this proposition. It appears to this Court, however, that the standard by which official conduct toward pretrial detainees should be judged is properly significantly tougher than that used to assess official conduct post-conviction. A person lawfully committed to pretrial detention has not been adjudged guilty of any crime; he has had only "a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). Under such circumstances the state may detain him to ensure his presence at trial and subject him to the restrictions and conditions of the detention facility, *Bell,* 441 U.S. at 536–37, 99 S.Ct. at 1872–73, but he should not be indiscriminately treated as one who has been condemned by the state. The Fourteenth Amendment should provide greater protection to these individuals relative to their convicted jailmates.

The Supreme Court addressed a similar argument in *Bell;* the Second Circuit had relied on "the premise that an individual is to be treated as innocent until proven guilty" to conclude that the Due Process Clause requires pretrial detainees to "be subjected to only those 'restrictions and privations' which

'inhere to their confinement itself or which are justified by compelling necessities of jail administration.' " *Id.* at 531, 99 S.Ct. at 1870 (citation omitted). This standard would have required far better living conditions in jails than the Eighth Amendment standard then in use. The Supreme Court responded by observing that there was no conceptual nexus between the presumption of innocence and a pretrial detainee's due process rights pending trial. While "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law," *id.* at 533, 99 S.Ct. at 1871 (quoting *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 402–03, 39 L.Ed. 481 (1895)), that principle did not thereby create a right under the Fourteenth Amendment to be comfortable while detained for trial. *Id.* 441 U.S. at 534, 99 S.Ct. at 1871 ("[T]he detainee's desire to be free from discomfort … simply does not rise to the level of those fundamental liberty interests [previously recognized by the Supreme Court as requiring constitutional protection].").

This Court suspects, however, that a pretrial detainee's desire to be free from physical abuse by officers of the state might bear constitutional imprimatur; if the Due Process Clause protects free, legally innocent citizens from physical abuse, e.g., *Rochin,* 342 U.S. 165, 72 S.Ct. 205, *McQurter v. City of Atlanta,* 572 F.Supp. 1401 (N.D.Ga.1983), *appeal dismissed,* 724 F.2d 881 (11th Cir. 1994), surely that same Due Process Clause protects detained, legally innocent citizens as well. Beatings are humiliating and physically invasive; far more so than the double-bunking, crowding, and prohibition on care packages at issue in *Bell.* *See* 441 U.S. at 526–27, 99 S.Ct. at 1867–68. *Cf. Rochin,* 342 U.S. at 172, 72 S.Ct. at 209–10 (finding that forcible pumping of petitioner's stomach violated Due Process Clause).

■ The Court does not here suggest directly employing a *Rochin*-like "shocks the conscience" standard; it would rarely be met. *See supra* note 4. Nor does the Court suggest importing into the Fourteenth Amendment the Fourth Amendment exces-

sive force analysis applied to those "seized" (i.e., arrested) by police officers—correctional officers have unique interests in security and order, recognized in *Bell,* that require plaintiffs to carry a more difficult burden. But that burden should not suddenly be the same Eighth Amendment standard applied to convicts. The Due Process Clause should not be emasculated because pretrial detainees happen to occupy cells and halls similar to those of their convicted fellows.

The expressed rationales behind legal development of the Cruel and Unusual Punishment Clause highlight the legal disparity that should separate standards for the unconvicted and the convicted. For example, in reviewing a convicted prisoners' conditions of confinement claim, the Supreme Court observed: "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). This point was later iterated in *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (noting language in *Rhodes* distinguishing between the (legal) infliction of pain on convicts and the (illegal) "unnecessary and wanton" infliction of pain on convicts), and *Hudson,* 503 U.S. at ——, 112 S.Ct. at 1000. *Hudson* further states that "because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* These observations drive current Eighth Amendment jurisprudence, and all rise from a perception that a prison represents a "large, confined population of convicted felons, not a nursery school." *Battle v. Anderson,* 788 F.2d 1421, 1426–27 (10th Cir.1986). Convicted criminals hold little sway in popular sympathies.

■■■ Efforts to "get tough" with convicted prisoners are inapposite to pretrial detainees, who are not yet rightly subject to society's condemnation as expressed in modern day Eighth Amendment law. Further, by defini-

tion, the Due Process Clause of the Fourteenth Amendment does not provide the same leeway to punish granted by the Cruel and Unusual Punishments Clause of the Eighth. *Bell* recognized this distinction, and formulated a standard making unconstitutional any conditions or restrictions imposed on detainees with an "intent to punish" them. 441 U.S. at 538, 99 S.Ct. at 1873–74. *See also Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1983); *infra* part C.1.c. If, as per *Rhodes, supra,* and a plausible reading of the Eighth Amendment, the state can punish convicts without violating the Constitution, and if the current Eighth Amendment standard reflects that leeway, how can that same standard be applied to pretrial detainees, who are explicitly protected from any "punishment" at all?

### d. A Revised Standard

■■■ The Court suggests that a due process analysis of excessive force in the pretrial context might require a lesser showing of intent than the current Eighth Amendment standard. *See Hudson,* 503 U.S. at ——, 112 S.Ct. at 999 (stating that "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). *Bell v. Wolfish* holds that the Fourteenth Amendment requires courts to decide whether any conditions or restrictions of pretrial detention are imposed for the purpose of "punishment" or "whether [the conditions or restrictions are] but an incident of some other legitimate governmental purpose." *Bell,* 441 U.S. at 538, 99 S.Ct. at 1873.

> Absent a showing of an expressed intent to punish on the part of prison officials, that determination will generally turn on 'whether an alternative purpose to which [the official's action] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'

*Id.* at 538, 99 S.Ct. at 1873 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)). If a condition or restriction is not reasonably related to a legitimate government goal—if it

is arbitrary and purposeless—a court may infer that the purpose of it was to punish the detainee. *Lynch v. Baxley*, 744 F.2d 1452, 1463 (11th Cir.1984). If a reasonable relation can be found, the condition or restriction, without more, does not amount to "punishment." The *Kennedy* case actually provides a list of factors to consider when deciding if a condition or restriction is truly "punishment." *See* 372 U.S. at 168–69, 83 S.Ct. at 567–68.

The problem with the *Bell* standard is that it is not designed for use of force cases. The case itself dealt with conditions of confinement, and the *Kennedy* factors, cited with approval in *Bell*, 441 U.S. at 537–38, 99 S.Ct. at 1873–74, are not readily applicable. Further, the "punishment" standard is in practice remarkably similar to that used in Eighth Amendment excessive force cases: as stated, under *Bell* courts will look for "intent to punish," while under *Hudson* courts will look for acts committed with "malicious or sadistic intent to cause harm." This convergence implies that there is little danger and much simplicity in following the same standard in both contexts; it will be a rare case where one is satisfied but not the other.

The Court has found one case following this reasoning and directly addressing the issue of what constitutional standard applies to use of force claims by pretrial detainees. In *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir.1993), the Fifth Circuit dealt with a § 1983 action brought by a detainee who allegedly had been beaten by his jailers after refusing to follow orders during a jail disturbance. After deciding that the claim was governed by the Fourteenth Amendment, the court reviewed the *Bell* standard for unconstitutional conditions or restrictions, and found that it did not lend itself to "analysis of claims of excessive use of force in controlling prison disturbances." *Id.* at 1446. This conclusion was based on (a) a footnote in *Bell* finding no reason to distinguish between convicts and detainees when reviewing "challenged security practices," 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28, and (b) the obser-

vation that it would be "impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security." *Valencia*, 981 F.2d at 1446. *Cf. Hamm*, 774 F.2d at 1573–74 (applying Eighth Amendment standard to conditions of confinement claim by detainee instead of *Bell* standard, because former is easier to apply to "a jail's provision of basic necessities such as food, living space, and medical care"). The Fifth Circuit then held that

> when a court is called upon to examine the amount of force used on a pretrial detainees [sic] for the purpose of institutional security, the appropriate analysis is that announced in *Whitley* and *Hudson:* whether the measure taken inflicted unnecessary and wanton pain and suffering depends on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."

*Id.* (quoting *Hudson*, 503 U.S. at ——, 112 S.Ct. at 998 (quoting *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson*, 481 F.2d at 1033))).[5]

*Bell*'s reference to "security practices," however, did not include physical abuse. The "security practices" at issue in that case were cell searches, body-cavity searches following contact visits, and a prohibition on inmates' receipt of packages from outside the institution, all designed to "make certain no weapons or illicit drugs reach[ed] detainees." 441 U.S. at 540, 99 S.Ct. at 1874 (footnote omitted). As for the impracticality of applying differing standards, the Court doubts, as noted earlier, whether that is sufficient reason to dilute the Fourteenth Amendment. As importantly, *Bell* provides the rudiments of a standard both sensitive to the Due Process Clause and no more difficult to apply than that of the Eighth Amendment.

■ Using *Bell* to furnish a unique standard in cases involving the use of force on pretrial detainees is not as difficult as *Valencia* implies. A potential solution could have

---

5. The court in *Valencia* purported to overturn *Shillingford*, but the excessive force test presented in both decisions is remarkably similar—*Shillingford* derived its test directly from *Johnson v.* *Glick*, and *Valencia* derived its test from *Whitley* and *Hudson*, which derived their standards from *Johnson v. Glick*, as well.

two prongs: First, search for evidence that the use of force was intended to punish the detainee. *See Bell*, 441 U.S. at 539 n. 20, 99 S.Ct. at 1874 n. 20 ("Retribution and deterrence are not legitimate nonpunitive governmental measures."). This intent inquiry is not substantially different than the current Eighth Amendment requirement, although intentionally easier for a plaintiff to meet. Second, if there is no direct evidence of intent, determine (1) whether a legitimate interest in the use of force is evident from the circumstances, and (2) if so, whether the force used was necessary to further that interest. *See id.* at 538–39, n. 20, 99 S.Ct. at 1874, n. 20 (noting that if conditions are so extreme that less harsh alternatives are easily available, those conditions constitute "punishment"). As in *Hudson v. McMillian*, the detainee would not be required to show severe injuries. 503 U.S. at ——— ———, 112 S.Ct. at 996–97. If the jail official fails *either* prong, his conduct violated the pretrial detainee's due process rights under the Fourteenth Amendment.

The practical effect of this analysis is to retain most of Judge Friendly's requirements in *Johnson* except that which requires a showing of malicious or sadistic intent. The new version allows proof under a lower, circumstantial standard. Returning to the instant case, under either the standard articulated in prior Eleventh Circuit cases or the standard proposed by the Court, the Court is compelled to agree with the Magistrate's conclusion: the available facts could support Harry Telfair's claims, and a trial is needed to further explore them.

### 2. Applying the Standards

 The Court will review Telfair's claim under both Judge Friendly's test, as presented in a recent Eleventh Circuit case, and the Court's revised approach. In *O'Neal v. DeKalb County*, a § 1983 action against two police officers under the Fourteenth and Fourth Amendments, the court stated that

In determining whether force used by police officers amounts to a constitutional deprivation, a court must consider " 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' "

850 F.2d at 656 (quoting *Gilmere*, 774 F.2d at 1500–01 (quoting *Johnson*, 481 F.2d at 1033)). *See also Hewett*, 786 F.2d at 1085 (applying same standard to claim of juvenile detainee). There are clearly factual disputes material to the legal outcome of this case under the standard in *O'Neal*. The parties to this suit differ on (a) whether Gilberg choked Telfair, (b) whether Telfair resisted the officers' efforts, (c) whether Gilberg was confronted by Ricky Mikel, and (d) whether Gilberg pushed Telfair to the floor of the cell in Pod 3–H after Telfair failed to sit down of his own accord. If the Court accepts Telfair's version of the facts, there is ample material to demonstrate required elements: that Gilberg used force both unnecessarily and maliciously by choking Telfair and exploiting his disability by pushing him over. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Brown v. Smith*, 813 F.2d 1187, 1189 (11th Cir.1987), *reh'g denied*, 818 F.2d 871 (11th Cir.1987). If Telfair's medical condition prevented him from sitting on the bunk without assistance, and Gilberg responded to this disability by shoving him to the floor, then the guard evinced the wantonness from which the Due Process Clause protects. If Telfair's refusal to sit was motivated by sheer obstinacy, and Gilberg and Gaines responded by seating him with a fireman's carry, then no constitutional violation occurred. There is no evidence on the record convincing the Court that either scenario is the more likely.[6]

---

**6.** It is important to note that, as Magistrate Smith observes, Telfair will bear the burden of proof at trial on whether Gilberg violated the relevant law. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. When the nonmoving party has the burden of proof, the party moving for summary judgment is not required to support its motion with affidavits or other material "negating" the nonmoving party's claim. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc). The moving party may simply show the Court that "there is

Under the Court's proposed analysis, the question of intent still remains—this time the intent to "punish" Telfair as opposed to the intent to maintain order. As for the second prong, the guards clearly had a legitimate interest in maintaining order and Telfair had knowingly broken the rules. Diffusing the situation, however, did not require the level of force of which Telfair complains. Choking him and knocking him over were not efforts reasonably necessary to further the legitimate goal of maintaining order, and this conclusion is buttressed by facts not in dispute: first, that *Telfair has a prosthetic hip*, and second, that his hip was injured as a result of his encounter with Gilberg.[7] Even in light of the appropriate judicial deference to prison administrators,[8] it is difficult for this Court to believe that a pretrial detainee with a prosthetic hip replacement presented three prison guards with such a threat as to justify choking him and then later pushing the disabled inmate to the floor of a cell.

Courts are fond of the observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." E.g., *Bennett*, 898 F.2d at 1533 (quoting *Johnson*, 481 F.2d at 1033). Telfair, however, was no "prisoner." He was, in the eyes of the law, still innocent of any crime. It is not a controversial proposition that the Fourteenth Amendment might protect legally innocent, disabled citizens from physical abuse by officers of the state.

## V. Conclusion

In sum, the facts show that *some* degree of force was necessary, especially after Officer Saxon assiduously explored alternative solutions. The issue is whether the level of force violated legal standards—either the standard in *O'Neal* or the less stringent standard proposed by this Court. On the current record, Officer Gilberg may have easily violated both. While Gilberg repeatedly insists that under the Eighth Amendment disputes over the reasonableness of the force used are not properly at issue, *Brown*, 813 F.2d at 1189, as the Court has taken pains to mention, this case is not properly resolved under the Eighth Amendment.

Because there are material issues of fact as to whether the conduct of Defendant Gilberg violated the Due Process Clause of the Fourteenth Amendment, the motion for summary judgment in his individual capacity is **DENIED.** Because claims against Chatham County must fail as a matter of law under a factual scenario most favorable to Plaintiff Telfair, Gilberg's motion for summary judgment in his official capacity is **GRANTED.**

SO ORDERED.

---

an *absence* of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). Here, however, Defendant Gilberg does not reveal such a gap.

7. Severe injury is not a requirement for an Eighth Amendment violation, *Hudson v. McMillian*, 503 U.S. 1, ——–——, 112 S.Ct. 995, 996–97, 117 L.Ed.2d 156 (1992), and it is not a requirement here. Intent is the "core judicial inquiry." *Id.* 503 U.S. at ——, 112 S.Ct. at 999.

8. In making our determinations, the Court remains aware of its limited role in the administra-

tion of detention facilities. "[P]rison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are. needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878 (citing cases). *See also Block*, 468 U.S. at 584–85, 104 S.Ct. at 3231–32; *. Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). Deference is also surely due administrators of pretrial detention facilities, but not when a party opposing a summary judgment motion presents a supportable set of facts comprising a constitutional violation.