Clifton REDMAN, Plaintiff–Appellant,

v.

COUNTY OF SAN DIEGO; Capt. Richard Beall; Lt. Robert Witcraft; Sgt. Dan Canfield; Deputy Gene Turner, and Does I through XX, Inclusive, Defendants–Appellees.

No. 87–6139.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1988.

Decided Feb. 13, 1990.

William D. Daley, Murphy & Daley, Chula Vista, Cal., for plaintiff-appellant.

Nathan C. Northup, Deputy County Counsel, County of San Diego, San Diego, Cal., for defendants-appellees.

Before TANG, THOMPSON and O'SCANNLAIN, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Clifton Redman was raped while confined at the South Bay Detention Facility, a jail operated by the San Diego County Sheriff's Department. The district court granted a directed verdict in favor of the defendants in Redman's action brought under 42 U.S.C. § 1983. The court determined that Redman had failed to establish facts sufficient for a reasonable jury to conclude that Redman had been treated with "reckless indifference" or with "callous disregard" for his safety. We interpret the district court's ruling as a determination that Redman failed to make a sufficient showing that he had been treated with "deliberate indifference" to his due process right to personal security. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## FACTS [1]

In January 1983, Clifton Redman was booked into San Diego County's South Bay Detention Facility ("SBDF") where he was held as a pretrial detainee. Upon arrival Redman, then eighteen years old, was placed in a receiving module designated as a "young and tender" unit. Redman was approximately 5′6″ tall and weighed 130 pounds. He had no prior criminal convictions.

About one week after his arrival, Redman was transferred from the "young and tender" unit into a "general population" or "mainline tank" module. Redman was assigned to a two-bunk enclosed single cell with an inmate named Kevin Clark. Clark was twenty-seven years old, approximately 5′11″ tall, and weighed 165 pounds. He was being held for a parole violation. Ac-

cording to an inmate status report on file at the facility, Clark was an aggressive homosexual. He had been transferred into the mainline tank from a homosexual module because of prior incidents of coercing and manipulating other inmates for sexual favors.

On the first night in his new cell, Redman was raped by Clark. The next day Redman telephoned his brother and his girlfriend and told them of the assault and his fear of future attacks. The mother of Redman's girlfriend called the SBDF and told jail personnel that Redman had been threatened with sexual assault and that her daughter had been threatened in the event Redman told anyone. One of the guards on duty called Redman down to the deputy station and, within the view of Clark and other inmates, asked Redman whether he was having any problems. Redman denied having any. Redman later testified he did so because he was afraid of what would happen to him, his girlfriend and his family if he told the truth in the presence of Clark and the other inmates. No further investigation or inquiry was made by any jail official. Redman was left in the cell with Clark.

The next day Redman was raped again, this time not only by Clark but by two other inmates. Each of the three inmates who raped Redman was older and larger than he, and each had an extensive criminal record. After the assaults, Redman again telephoned his brother, this time talking and crying for an extended period of time in an open area of the facility. The next morning Clark raped Redman again. That afternoon Redman was released from custody.

Each of the inmates who raped Redman was subsequently charged with sodomy. Each pleaded guilty to the sexual assaults.

After his release, Redman brought suit in district court under 42 U.S.C. § 1983 against defendants County of San Diego, Sheriff John Duffy, and various officials employed at the South Bay Detention Facil-

---

1. As noted *infra*, because this case comes to us from a decision of the district court entering a directed verdict, we take the evidence in the light most favorable to appellant Redman. *See Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989).

ity. The district court's directed verdict resulted in dismissal of the case as to all defendants. Redman appeals.

## ANALYSIS

We review the propriety of a directed verdict de novo. *Meehan v. County of Los Angeles*, 856 F.2d 102, 106 (9th Cir.1988). "We must view the evidence in the light most favorable to the nonmoving party and draw all inferences in favor of that party." *Id.* A directed verdict should be granted when the evidence permits only one reasonable conclusion as to the verdict. *Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 345 (9th Cir.1978). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986) (citing *Neely*, 584 F.2d at 345).

### A. *Defendant County of San Diego*

■ At the outset we address the district court's dismissal of the County of San Diego. The County may not be held liable for acts of jail officials unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). There is no evidence in the record that SBDF personnel were acting pursuant to an official policy when they placed Redman in Clark's cell, or when they responded as they did to the warning phone call. If anything, the personnel were acting in contravention of inmate classification policies when they assigned Redman to Clark's cell.

**2.** Although the district court did not base its directed verdict on this reasoning, we may affirm on any basis that has legal merit and factual support in the record. *See Lee v. United States*, 809 F.2d 1406, 1408 (1987), *cert. denied*, 484 U.S. 1041, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988).

**3.** The statute provides in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage ...

■ We conclude that there is no evidence from which a reasonable jury could find that the County of San Diego has any liability to Redman under 42 U.S.C. § 1983. Accordingly, the district court's directed verdict as to the County is affirmed.[2]

### B. *Individual Defendants*

The individually named defendants in this case are: Sheriff John Duffy, the Sheriff of San Diego County, who was in charge of all county detention facilities at the time Redman was incarcerated; Captain Richard Beale of the Sheriff's Department, who had supervisory responsibility of the SBDF; Lieutenant Robert Witcraft, second in command at the SBDF; Sergeant Daniel Canfield, a shift supervisor and watch commander at the SBDF; and Deputy Gene Turner, who worked as a station deputy in the mainline module.

Section 1983[3] requires a claimant to prove (1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege or immunity protected by the Constitution or laws of the United States. *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir.1988). It is not disputed here that the defendants were acting under color of state law. The issue is whether the defendants' conduct deprived Redman of a federally-protected right; in this case, a right protected by the Constitution.

#### 1. *Level of Culpability Required to Constitute a Deprivation*

■ "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].' "

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

*Leer,* 844 F.2d at 633 (quoting *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978)).

Redman contends the individual county defendants deprived him of his constitutional right to personal security under the due process clause of the fourteenth amendment.

The Supreme Court "has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause ...[, a]nd that right is not extinguished by lawful confinement, even for penal purposes." *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982) (citations omitted). This circuit has stated that "insufficient protection of a prisoner resulting in harm inflicted by other inmates may also violate the prisoner's due process rights." *Hernandez v. Denton,* 861 F.2d 1421, 1424 (9th Cir.1988) (citing *Youngberg v. Romeo,* 457 U.S. at 315–16, 102 S.Ct. at 2457–58). The question is, what level of improper conduct must a pretrial detainee show to establish "insufficient protection," and thus a violation of his right to personal security under the fourteenth amendment? This question has been left open by the Supreme Court. *Daniels v. Williams,* 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662 (1986); *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). *See also City of Canton, Ohio v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1204 n. 8, 103 L.Ed.2d 412 (1989).

Our inquiry involves consideration of where on the bench of culpability to make the mark by which to measure the defendants' conduct in this section 1983 action. At one end of the bench is "mere negligence." This is not sufficient to trigger the substantive due process protections of the fourteenth amendment. *Daniels v. Williams,* 474 U.S. at 330–32, 106 S.Ct. at 664–65; *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). *See also Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir.1989). Near the opposite end is "deliberate indifference." This kind of conduct is sufficient to trigger a convicted prisoner's constitutional rights under the eighth amendment, *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986), and therefore it also must be sufficient to trigger a pretrial detainee's constitutional rights under the fourteenth amendment. *See Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Should we then set the mark at the point where the defendants' conduct reaches "deliberate indifference," or should some lesser mark be notched, *e.g.,* "gross negligence" or "recklessness?"

We hold that jail officials' conduct toward pretrial detainees must reach the level of deliberate indifference before a section 1983 claim can be stated based upon a violation of the detainee's due process right to personal security under the fourteenth amendment.

As previously noted, the deliberate indifference standard already obtains in this circuit when a prisoner bases a personal security claim on the eighth amendment. *Berg v. Kincheloe,* 794 F.2d at 459. *See also Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988). In *Berg* we recognized the difficulties inherent in judicial evaluation of prison administrative decisions. "Protecting the safety of prisoners and staff involves difficult choices and evades easy solutions. Courts often lack competence to evaluate fully prison administrative decisions." *Berg v. Kincheloe,* 794 F.2d at 460 (citations omitted). In so reasoning, we relied on the analysis of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*Bell v. Wolfish* involved a conflict between the constitutional rights of pretrial detainees and numerous practices and procedures promulgated by prison officials. The *Bell* Court, in resolving this conflict, reasoned that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546, 99 S.Ct. at 1877 (footnote omitted). Because of the importance of internal security within the corrections facility, "[p]ri-

son officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547, 99 S.Ct. at 1878. "[Prison practices] must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* For these reasons, prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citations omitted).

The Supreme Court, in *Bell,* drew no distinction between pretrial detainees and convicted inmates in reviewing prison security practices. *Bell v. Wolfish,* 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28. Indeed, the Court rejected the detainees' arguments that prison inmate cases requiring deference to prison officials were not applicable to pretrial detainees:

> Respondents argue that this Court's cases holding that substantial deference should be accorded prison officials are not applicable to this case because those decisions concerned convicted inmates, not pretrial detainees. We disagree. Those decisions held that courts should defer to the informed discretion of prison administrators because the realities of running corrections institutions are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch. While those cases each concerned restrictions governing convicted inmates, the principle of deference enunciated in them is not dependent on that happenstance.

*Id.* at 547 n. 29, 99 S.Ct. at 1878 n. 29 (citations omitted). The concerns expressed by the Court in *Bell* and this Court in *Berg* apply equally here. We can discern no principled reason substantial enough to differentiate between the "wide-ranging deference" accorded prison officials in the execution of their procedures in a prison and county officials in the execution of their procedures in county jail facilities *vis-a-vis* pretrial detainees. In either case the defendants' conduct must amount to deliberate indifference to support an action under 42 U.S.C. § 1983. We next consider the evidence upon which the district court granted a directed verdict in favor of the defendants.[4]

### 2. Culpability Evidence Presented at Trial

█ The district court's order granting a directed verdict was appropriate if the evidence permitted only one reasonable conclusion as to the verdict. *Neely v. St. Paul Fire and Marine Ins. Co.,* 584 F.2d 341, 345 (9th Cir.1978). If conflicting inferences could be drawn from the evidence, the case should have gone to the jury. *Rutherford v. City of Berkeley,* 780 F.2d 1444, 1448 (9th Cir.1986).

In *Berg v. Kincheloe* we defined deliberate indifference to a prison inmate in a context similar to this one. There we stated:

> The "deliberate indifference" standard requires a finding of some degree of "individual culpability," but does not require an express intent to punish. The standard does not require that the guard or official " 'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a

---

**4.** In granting a directed verdict for all defendants, the district court concluded that "although the plaintiff's evidence shows that someone may well have been negligent in their treatment of Mr. Redman ... the evidence is not sufficient to justify a verdict against these individual defendants, or any of them, or against the County of San Diego based upon reckless indifference to his situation or callous disregard of his situation." Trial Transcript at p. 269. The district court used terms somewhat different from "deliberate indifference," but the standard it articulated was, if anything, more lenient to the plaintiff's case. If Redman failed to establish "reckless indifference" or "callous disregard" as the trial court concluded, he most certainly failed to establish "deliberate indifference."

mere suspicion that an attack will occur.'"

794 F.2d at 459 (citations omitted).

■ The evidence at trial showed that the jail facility had a procedure for segregating inmates who were criminally unsophisticated, slight in build, and either youthful or old and feeble in age and appearance. At the time Redman was booked into the jail, he fit within this profile. After spending a week in a "young and tender" module, Redman was transferred to the "mainline" module which housed the general jail population. The jail officials assigned Redman to a cell with Clark, a confirmed homosexual who had been removed from a homosexual module after allegations were made that Clark had been coercing others in the module into sexual favors.[5]

5. According to a report on file at the South Bay Detention Facility dated December 28, 1982, Clark's parole officer requested that Clark be transferred to a homosexual module due to Clark's concern about being teased and sexually harassed because of his homosexuality. In response to this report, Clark had been transferred into the homosexual module. A later report dated January 23, 1983 noted that a jail deputy had been "informed by an unnamed source that Clark had been coercing and manipulating other inmates in the tank for sexual favors." This report also stated: "Since Clark by jail standards isn't required to remain in [the homosexual module] he was placed in [a mainline module]." The sexual attacks on Redman occurred in the mainline module on January 29 and January 30, 1983. For the purposes of reviewing the directed verdict, we assume that the officials responsible for Redman's transfer into the mainline unit with Clark were aware of these reports.

6. The following is excerpted from the mother's testimony:
Q. And you called then South Bay facility?
A. Yes, and I talked to two people there. The first person relayed me to the second one who was in charge of wherever Cliff was.
Q. What did you tell them, if you recall?
A. I told them that I was concerned about Cliff Redman, who was in their jail there, that he had told my daughter that he was very upset and afraid, very afraid of being assaulted, and he had been threatened by people who were also in the jail, if he told anyone about any of the threats that had been made to him, that they could also hurt our daughter because they knew our address from letters

After the transfer, Redman was raped. He told his brother and girlfriend about it. His girlfriend's mother called the jail to express her concern for Redman's safety. It is clear from her testimony that when she called she did *not* report that a rape had already occurred (nor did she know that one had). Trial Transcript at p. 155. She did, however, report that Redman "was very afraid of being [sexually] assaulted, and ... had been threatened by people who were also in the jail, if he told anyone about any of the threats that had been made to him, that they could hurt our daughter because they knew our address from letters she had sent Clifton." Trial Transcript at p. 151.[6]

The call, no doubt due to its alarming nature, prompted action. In response to it, a jail official questioned the youthful and slightly built Redman as to his general well being.[7] This questioning occurred in front

she had sent Clifton. Evidently they'd seen the address where we live.
Q. Did you convey during this conversation the fact that it was a sexual assault that was involved?
A. Yes.
Q. and what was the response or what was the gist of the person's response?
A. ... Basically that all Cliff had to do, if he had any problem at all or was afraid of anyone hurting him, is to tell them....
Q. Do you recall him saying anything further during that conversation?
A. Yes. He did say, he said, "Well, you know, we can't watch him like this is a baby-sitting service or something. You know, if he has any problems, he can call us.
Q. Did you feel as though—go ahead.
A. "We can't keep a closer eye on him."
Trial Transcript at 151–152.

7. The following is excerpted from the testimony of Deputy Jose Green, the guard who questioned Redman:
Q. And do you remember him coming down that day?
A. Yes, sir.
Q. What prompted you to have him come down?
A. I received a phone call from one of the control deputies that he had received a call from either his mother, I believe, that he was having some kind of problems in the mod.
Q. All right. And they didn't describe to you the kind of problem he was having?
A. No, sir.
Q. You don't recall who it was who called you?

of Redman's assailant and other inmates of the jail. Redman registered no complaints. But to have reported that an assault had occurred would have been to "rat" on Clark who, according to Redman's testimony, had vowed revenge on Redman, his family and girlfriend if Redman "squealed." Moreover, the testimony of Redman's girlfriend's mother gives us an indication of the kind of investigation the officials conducted. She stated that when she telephoned the jail and warned the control deputy of Redman's predicament, the deputy responded to the effect that they weren't operating a "baby-sitting service." *See* n. 6 *supra*. A reasonable jury could find under the evidence that the investigation undertaken by the jail officials was so ineffective and perfunctory as to demonstrate a lack of due care. But jail personnel did respond to the call. Redman was questioned and he denied the existence of any problem. The jail officials were not deliberately indifferent to Redman's situation. Redman thus failed to establish a deprivation of a constitutional right under *Daniels, Davidson* and their progeny.[8]

The facts on which the district court based its directed verdict differ from the allegations made by the *pro se* plaintiff in *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986). There, we reversed the district court's summary judgment in favor of the prison guard. We held that by a liberal reading of the *pro se* plaintiff's complaint the allegations could be construed as stating a section 1983 claim based on deliberate indifference. We construed the allegations of the complaint as alleging that the plaintiff had been placed in protective custody because his "life was in danger"; the plaintiff specifically told the guard his life would be in danger if he reported to a particular job, and the guard ignored the plea and ordered the plaintiff to report to

the job anyway. At that job location, the plaintiff was beaten and raped. The guard offered nothing to refute these allegations. *Id.* at 460–61.

In the present case, the jail officials knew that the assailant Clark was a homosexual who had a history of trying to coerce others into sexual favors. Aside from this, however, there was only the circumstance of Redman's "young and tender" profile to lead the officials to suspect that if they put Redman in Clark's cell a sexual attack might occur. This information gave the jailers, at best, a suspicion of a possible attack. "Mere suspicion," however, does not equate with "deliberate indifference." *Berg*, 794 F.2d at 459. Transferring Redman into Clark's cell may well have been an act of negligence, but it was not an act of deliberate indifference to Redman's personal security.

The facts of *Davidson v. Cannon*, the case upon which the district court relied in granting the defendants' motion for a directed verdict, closely parallel the facts of this case. In that case, Davidson, a prison inmate, was threatened with physical harm by a fellow inmate. He sent a note reporting the threat to the prison's assistant superintendent, who read the note and sent it to the prison's correction sergeant. The latter, although informed of the note's contents, left the note on his desk unread and subsequently forgot about it. Over the weekend, when the two prison officials who knew of the note were off duty, Davidson was attacked and seriously wounded by the inmate who had threatened him. The Supreme Court concluded that while the prison officials' "lack of due care ... led to serious injury, ... that lack of care simply [did] not approach the sort of abusive government conduct that the due process

---

A. No, sir.
Q. And so he came down, and how long did you talk to him?
A. Maybe a few seconds.
Q. What did you ask him?
A. "Are you having any problems in the mod?"
Q. What did he say?
A. "No."
Q. Anything else you recall being asked?

A. No, sir.
Trial Transcript at 107.

**8.** Because we conclude the trial court did not err in determining that the evidence was insufficient to permit a reasonable jury to find a constitutional violation, we do not assess the individual defendants' varying roles in connection with the injury Redman sustained.

clause was designed to prevent." *Davidson,* 474 U.S. at 347–48, 106 S.Ct. at 670–71. The facts of the present case compel a similar conclusion.

We emphasize that our holding is a constitutional one. That Redman cannot recover under section 1983 does not change the fact that he was the victim of a nightmarish series of assaults to his person and his dignity. It may be that personnel at the SBDF contributed to these harms through negligence redressable by state law. *See, e.g.,* Cal.Gov.Code §§ 820–820.8 (West 1980). We have concluded, however, that Redman has not presented evidence of behavior violative of his constitutional rights. "Our Constitution deals with large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). As the Supreme Court has noted:

> That injuries inflicted by governmental negligence are not addressed by the United States Constitution is not to say that they may not raise significant legal concerns and lead to the creation of protectible legal interests. The enactment of tort claim statutes, for example, reflects the view that injuries caused by such negligence should generally be redressed. It is no reflection on either the breadth of the United States Constitution or the importance of traditional tort law to say that they do not address the same concerns.

*Id.* at 333, 106 S.Ct. at 666 (footnote omitted).

AFFIRMED.

TANG, Circuit Judge, Concurring in Part and Dissenting in Part:

The majority distinguishes well the standards for government tort and constitutional liability. I dissent, however, because I believe the majority usurps the jury's proper function of determining whether the government's conduct amounted to deliberate indifference in this case. In our review of the directed verdict in this case, we must view the evidence in a light most favorable to Redman and draw all inferences in his favor. *See Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985). Because substantial evidence would permit a jury reasonably to conclude that Redman's jailers were deliberately indifferent to his personal security, I would reverse for trial. *See id.*

Redman's evidence necessitates jury evaluation not only of his jailers' acts, but also of his jailers' motives under the deliberate indifference standard. The key factual issue in this case was what Redman's jailers knew and how they responded to that knowledge when the guard called Redman over to the guard station and asked if he was having any problems. At that point jail officials knew that Redman, a slightly-built eighteen-year-old with no prior convictions, was especially vulnerable to sexual assault. They knew this from the profile they conducted upon Redman's entry which classified him for the "young and tender" jail module. They knew that Clark, Redman's "mainline tank" cellmate, was an aggressive homosexual who was transferred from the homosexual module into the "mainline tank" with Redman precisely because he was "coercing" sexual favors from other prisoners. Moreover, jail officials knew that Clark was incarcerated for violating parole from a conviction for a registrable felony sex offense.

Jail officials were also alerted from the girlfriend's mother's call that Redman had received threats of sexual assault, and was terrified of those threats. That call also informed jail officials that Redman was afraid to complain to them because of threats of reprisal against his girlfriend. The girlfriend's mother specifically told jail officials that Redman took the reprisal threats seriously because those who threatened him knew the girlfriend's address. Finally, the guard who questioned Redman must have known that an inmate who had threatened Redman could observe if not hear the guard's exchange with Redman, conducted in full view of the jail module.

Having heard the cumulative weight of this evidence, a reasonable jury could have concluded that Redman's jailers acted with deliberate indifference to his personal security. The jury could have inferred that the guard who questioned Redman deliberately exposed him, knowing Redman was too frightened to complain in full view of his assailants. Jail officials had thus performed an unwelcome duty of responding to a citizen's concern, and yet had also asserted the attitude that inmates must fend for themselves. As the jail official who took the call stated, "Well, you know, we can't watch [Redman] like this is a baby-sitting service or something."

A reasonable jury could have found, then, that Redman's jailers knew he was vulnerable to sexual assault, knew of Clark's proclivity to assault others sexually, knew Redman had received threats, knew Redman feared reprisal if he complained, and knew that questioning Redman in front of other inmates could serve only to increase Redman's peril and compel him to keep silent. The jury could therefore have concluded that jail officials had much more than a "mere suspicion" Redman would be raped. Indeed, the jury could have concluded that Redman's jailers were deliberately indifferent to the imminent danger of Redman's rape.

The majority, by analyzing the officials' conduct only as isolated incidents, purports to reach the legal conclusion that jail officials did not act with deliberate indifference toward Redman's plight. I might agree that, in isolation, "[t]ransferring Redman into Clark's cell may well have been an act of negligence, but it was not an act of deliberate indifference." *Supra* at 368. I might also agree that upon notice of threats against Redman, "the investigation undertaken by jail officials was so ineffective and perfunctory as to demonstrate a lack of due care," but that jail officials were not, in that instance alone, deliberately indifferent because they "did respond" to the threat. *Supra* at 368. The persuasiveness of Redman's evidence, however, is in its cumulative effect. From the accumulated weight of the evidence, a reasonable jury could have inferred that

jail officials acted with deliberate indifference to Redman's personal security. A directed verdict in this case was error because, when viewed in a light most favorable to him, there is indeed "substantial evidence to support a verdict for" Redman. *Peterson,* 771 F.2d at 1256.

The majority relies on *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) to decide that Redman's jailers merely lacked due care. In *Davidson* the plaintiff prisoner denied that his jailers were more than negligent. *See id.* at 347, 106 S.Ct. at 670. Instead, the prisoner agreed that prison officials merely *inadvertently* failed to respond to his note regarding a threat he received because they were attending other prison "emergencies." *Id.* at 345, 348, 106 S.Ct. at 669, 670. Moreover, in *Davidson,* the prisoner "testified that he did not foresee an attack" when he wrote the note, and indeed prison officials did not themselves view the note "as urgent because on previous occasions when [the prisoner] had a serious problem he had contacted [prison officials] directly." *Id.* at 345–46, 106 S.Ct. at 669–670. In Redman's case, however, jail officials had credible reason to believe the threat of sexual assault was grave. Jail officials' inadequate response to Redman's peril may have been inadvertent, but it may also have been deliberately indifferent, increasing his peril. These questions of fact, dependent upon inferences from the evidence and evaluations of credibility, belong to jury determination.

Indeed, Redman's case is similar to *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989), wherein we held that key factual issues required jury determination. In *Wood,* we could not say as a matter of law that a state trooper had not acted with deliberate indifference when he refused the companion of an arrestee a ride home and thus exposed her to danger. *Id.* at 590. Instead, we said the jury must decide whether the trooper knew or should have known of the dangers the companion faced late at night in a high crime area. *Id.* Similarly, in Redman's case, we should not say as a matter of law that jail officials did

not act with deliberate indifference in questioning Redman in front of his attacker Clark. A jury should decide whether Redman's jailers knew or should have known of the dangers Redman faced from Clark. At last, a jury should decide whether jail officials' knowledge of the dangers he faced and their handling of the call they received alerting them to Redman's peril placed Redman in a position of heightened danger.

The majority's decision in *Redman* thus conflicts with the *Wood* analysis. As in *Wood*, application of the deliberate indifference standard to Redman's case requires not only determination of governmental acts, but also of the motives behind those acts. As an appellate court we cannot conclude from this record that Redman's jailers were not deliberately indifferent to his plight. Instead, we should respect juries' unique ability to evaluate government conduct for deliberate indifference. *See Berg v. Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986). Juries encompass the wealth of community experience, hear the evidence first hand, and weigh its credibility. In determining that the government's motives in conduct resulting in grave injury to Redman did not amount to deliberate indifference, the majority improperly intrudes on the jury's function.

Finally, because I would reverse for jury determination under the deliberate indifference standard, I also depart from the majority's conclusion that Redman failed to present evidence of a constitutional violation. In *Daniels v. Williams*, cited by the majority, the Supreme Court reiterated that the Fourteenth Amendment secures " 'the individual from the arbitrary exercise of the powers of government' " and prevents "governmental power from being 'used for purposes of oppression.' " *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111, 116, 28 L.Ed. 232 (1884) and *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277, 15 L.Ed. 372 (1856)). As an identified "young and tender" detainee, Redman necessarily depended upon his jailers, the government, to secure his personal security while confined. Tort law may assure Redman a remedy for his jailers' negligent "contribution" to Redman's trauma, as the majority observes. But the Constitution at last restrained his jailers "from abusing governmental power, or employing it as an instrument of oppression." *Davidson*, 474 U.S. at 348, 106 S.Ct. at 670.

From the evidence Redman presented, a jury could reasonably find that his jailers' response to the call alerting them to Redman's peril was callous and arbitrary. Further, a jury could find the jailer's questioning of Redman in front of his attacker deliberately abusive and oppressive. Indeed, only a jury could determine whether Redman's jailers acted negligently or whether they wielded their governmental power over Redman arbitrarily and oppressively, deliberately refusing to aid him in a time of known peril. If Redman's jailers deliberately refused to secure his personal security while he was subject to government's total control, then Redman rightly invoked the Constitution to redress him for such abusive governmental conduct. If properly left to a jury's evaluation of the jailers' conduct, Redman's case turns on just such a constitutional issue.