Edgar MUNERA, Plaintiff,

v.

**METRO WEST DETENTION CENTER, et al.,**
Defendants.

No. 02–23612–CIV–MOORE.

United States District Court,
S.D. Florida.

Dec. 14, 2004.

Edgar Munera, Pro Se, East Elmhurst, N.Y.

Robert Ginsburg, County Attorney, Scott B. Mario, Assistant County Attorney, and Steven A. Stieglitz, Assistant County Attorney, for County.

### ORDER ADOPTING IN PART MAGISTRATE'S REPORT

MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiff Edgar Munera's *pro se* civil

rights complaint for damages pursuant to 42 U.S.C. § 1983.

THIS MATTER was referred to the Honorable Patrick A. White, United States Magistrate Judge. Magistrate Judge White issued a Report dated November 24, 2004 (DE # 44), recommending that Defendant White's Motion for Summary Judgment (DE # 30) be granted, and that Plaintiff's Motion for Summary Judgment (DE # 31) be denied. A review of the record reflects that Plaintiff Munera has not filed objections to the Report. After a *de novo* review of the record, it is

ORDERED AND ADJUDGED that Magistrate Judge White's Report (DE # 44) is ADOPTED IN PART. The Court makes the following citation corrections (in bold) in the aforementioned Report:

1. Page 9: *H.C. v. Jarrard,* 786 F.2d 1080 (11th Cir.1986).

2. Page 9: *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Accordingly, it is

ORDERED AND ADJUDGED that:

1. Defendant White's Motion for Summary Judgment (DE # 30) is GRANTED.

2. Plaintiff Munera's Motion for Summary Judgement (DE # 31) is DENIED.

3. This case is CLOSED.

4. All motions not otherwise ruled upon by separate order are DENIED AS MOOT.

---

1. All other claims and defendants were previously dismissed. [DE# 16].

2. At inception of the case it was unclear whether or not Munera was a convicted prisoner; but it is now clear that he was in pretrial detention at the time of the events alleged. Munera stated in a filing, at DE# 17,

*REPORT OF MAGISTRATE JUDGE*

WHITE, United States Magistrate Judge.

## I. *Introduction*

The plaintiff, Edgar Munera, filed a *pro se* civil rights complaint for damages pursuant to 42 U.S.C. § 1983. The case is pending on claims against Cyril White, a Miami–Dade County Correctional Officer assigned to Ward D at Jackson Memorial Hospital ("JMH").[1] Ward D is a secure area of the hospital used to house inmates undergoing examination or treatment

Munera's claims stem from a visit to the optometrist on March 27, 2002, at Bascom Palmer Eye Institute ("Bascom Palmer"), which is part of the medical complex at JMH. Munera was then in Miami–Dade County custody, as a pretrial detainee.[2]

Munera alleges that while escorting him to the eye appointment at Bascom Palmer, and guarding him during the examinations, Officer White used excessive force, and threatened him. Munera also alleges that White deprived him of access to medical care, when he decided to have Munera removed from the Bascom Palmer clinic, and returned to Ward D, before completion of the scheduled procedures.

The defendant has moved (DE# 30), and the plaintiff has cross-moved (DE# 31) for summary judgment, pursuant *Fed.R.Civ.P.* 56.

### A. *The Plaintiff's Allegations*

In his complaint [DE# 1], Munera alleges that on March 27, 2002, he was transported from TGK to JMH, to attend a long

---

that he was a pretrial detainee, assigned to Turner Guilford Knight Correctional Center ("TGK"); and four months after inception of the lawsuit, Munera had filed a Notice of Change of Address (DE# 8) announcing his transfer from TGK to the South Florida Reception Center, which is a Florida Department of Corrections Facility.

awaited ophthalmology appointment. He arrived at the hospital, and during the course of the eye appointment, he was in Officer White's custody. Munera alleges he was in handcuffs and that White put him in a wheelchair to move him around. The eye appointment included care by more than one medical staff member, interrupted by periods in a waiting room, during which White guarded Munera.

Munera alleges that Officer White used excessive force against him. In brief, the bases for this claim are: 1) Munera's contention that his restraints were too tight, a problem that White did not alleviate; and 2) that at one point when Munera tried to get up, allegedly to show White an abrasion on his wrist, White used force to place him back into the wheelchair, and applied a second set of handcuffs, allegedly causing additional pain and wrist abrasions.

Munera's claim that Officer White verbally abused and threatened him is based on events that allegedly occurred while he waited between examinations, and later during the incident when White used force to place him back into the wheelchair. Munera alleges that in the waiting room White asked him questions about his arrest, his nationality, etc., which Munera told White he would not answer "because you are not my lawyer." White allegedly said that he knew the reason why Munera was arrested, that Munera was "depraved," and allegedly called Munera a "mother f* * * * hispanish [sic]." Munera was taken for an examination, and when he was returned to the waiting room White continued to taunt him, calling him a "f* * * * abusar [sic]." Later, when White forced Munera back into the wheelchair, White allegedly "threatened me by the weapon" and said "I[f] you move yours hands again I going to shot you mother f* * * * [sic]."

Munera alleges that White then "cancel my interview by my doctor" and removed him from the Bascom Palmer clinic. Munera states that earlier, between examinations, he was told by a nurse that when his tests were completed he needed to "see the surgeon." Munera further alleges that because Officer White removed him from the Bascom Palmer clinic before his "interview by my doctor," he "got exposed to coming blind [and] some times I lost my vision includid headaches and dizzyess [sic]."

## B. The Standard of Review, Notice to the Pro Se Plaintiff, And the Parties' Filings in Support of Their Own Motions and in Response to the Opposing Parties' Motions

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of a law.

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that summary judgment should be entered against:

[A] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with re-

spect to which she has the burden of proof. (Citation omitted).

Thus, pursuant to *Celotex* and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those portions of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. *Hoffman v. Allied Corp.,* 912 F.2d 1379, 1382 (11 Cir.1990).

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11 Cir.), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). It is the non-moving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. *Earley v. Champion International Corp.,* 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party, even a *pro se* prisoner, cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial *Fed.R.Civ.P.* 56(e); *Coleman v. Smith,* 828 F.2d 714 (11 Cir.1987); *Brown v. Shinbaum,* 828 F.2d 707 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Baldwin County, Alabama v. Purcell Corp.,* 971 F.2d 1558 (11 Cir.1992).

██ Despite the liberality with which courts are obliged to interpret *pro se* complaints, "a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford,* 906 F.2d 667, 670 (11 Cir.1990).

Upon the filing of the Defendant's motion for summary judgment (DE# 30), an Order of Instructions (DE# 32) was entered informing the *pro se* plaintiff of his right to respond, and instructing him about the requirements of *Fed.R.Civ.P.* 56, and the nature of a proper response to such a motion.

In opposition to defendant White's motion for summary judgment (DE# 30) and supporting Affidavits (DE# 26), plaintiff Munera filed an unsworn Response (DE# 39); and White filed his Reply (DE# 41).

The plaintiff also filed his own motion for summary judgment (DE# 31), in opposition to which defendant White filed a Supporting Memorandum (DE# 40).

## II. *Discussion*

For reasons discussed further, below, in Sections "II.A", "II.B." and "II.C." of this Report, plaintiff Munera's unsworn response in opposition to defendant White's motion for summary judgment, and Munera's own unsworn motion for summary judgment and his exhibits attached thereto, create no genuine issues as to any material fact in regard to the claims of use of force, verbal abuse and threats, and denial of access to medical care. As to these claims it is clear that the defendant Correctional Officer, Cyril White, is entitled to qualified immunity which under appropriate circumstances serves to insulate governmental officials from personal liability for actions taken pursuant to their discretionary authority. *See: Saucier v.*

*Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Flores v. Satz,* 137 F.3d 1275 (11 Cir.1998); *Foy v. Holston,* 94 F.3d 1528 (11 Cir.1996).

The facts that are unrefuted by plaintiff Munera's unsworn filings, are established by defendant White through: 1) White's own Affidavit; 2) the Affidavit of Nurse Lynette Da Silva who examined Munera for injuries on 3/27/02 after Officer White removed him from the Bascom Palmer Eye Institute on that date; and 3) the Affidavit of Bascom Palmer Optimetric Techician, Tiffany Johnson, whose duties are to administer vision tests, and maintain Bascom Palmer patient testing records, and whose Affidavit summarizes the contents of Munera's records for his four visits and examinations at Bascom Palmer between February 27, 2002 and December 16, 2002.

### THE AFFIDAVITS

#### Affidavit of Cyril White

In his Affidavit (DE# 26, at pp. 3–7), Cyril White states that Corrections Department policy requires all inmates being transported within the confines of JMH to be shackled with handcuffs and a waist chain, and forbids removal of the restraints except upon orders of medical personnel, with approval of the Ward D supervisor. The restraints are designed restrict inmates' freedom of movement, and while cuffs cannot tighten on their own, the can feel tighter than when applied if an inmate tries to move his arms away from his body. While being transported from Ward D at JMH to Bascom Palmer, Munera was restrained in accordance with the policy, and when Munera complained that the restraints were too tight, White inspected them. He found that they were properly adjusted, and he explained to Munera that they were intended to restrict movement, and that his movements, reaching out with his arms cause the cuffs to slide down his arms and feel tighter. [White Affidavit, ¶¶ 3–6].

After their arrival at Bascom Palmer, security escorted White and Munera to a waiting room. The clinic was open to the public, and other patients were in the same room. After nearly an hour, Munera's name was called. White escorted him to an exam room. A nurse checked Munera's eyes and gave him some Easter candy, which White confiscated because Department policy forbids inmates to receive food from the public. Munera became agitated, and White explained to him why he took the sweets. [White Affidavit, ¶¶ 8–9].

After Munera was taken to a second room to get eye drops, he was returned to the waiting room for his eyes to dilate. He continued acting in an agitated manner and complained that his cuffs were tight. White told him that not long before he had checked the cuffs, and that if he would keep his hands close to his body the cuffs would be more comfortable. Munera suddenly got up from his wheelchair and said he wanted to sit by the window. White tried to calm him, and said that he would allow Munera to change places in the room, but that he had to ask White's permission first, because Munera was an inmate and members of the public were present. About five minutes later Munera again jumped up, and wanted to return to the wheelchair. Then, when he got to the wheelchair, Munera changed his mind, and attempted to again move across the room. Based on his training and experience, White felt that Munera was exhibiting bizarre behavior, and he knew from Munera's jail card that he had a history of psychological problems. White was concerned for the safety of the civilians present in the waiting room. For that reason he grabbed Munera's hospital gown and

pulled back on it until Munera was seated in the wheelchair. White then cuffed Munera's hands to each side of the wheelchair. White never withdrew his gun, or threatened to shoot Munera. [White Affidavit, ¶¶ 10–13].

Due to Munera's strange behavior, and the fact that he was in a public area, White was concerned about safety, and worried that Munera might become violent or attempt to escape. White radioed for help, and used his phone to request officer assistance in transporting Munera back to Ward D at the hospital (JMH). White informed Bascom Palmer medical staff that he was returning Munera to Ward D because he considered him to be too great a risk. With officer assistance, White escorted Munera back to Ward D, and offered him a chance to make a written statement, which Munera refused. White's Affidavit further states that Munera received no scratches or abrasions on his wrists as a result of the incident. White further states that Munera was examined by Nurse Da Silva about one hour after the incident. [White Affidavit, ¶¶ 14–16].

### Affidavit of Lynette Da Silva

In her Affidavit (DE# 26, at pp. 8–10) Lynette Da Silva states that she is a nurse with Hospital Services at Ward D of JMH, and was employed in that capacity on March 27, 2002. [Da Silva Affidavit, ¶ 2]. Da Silva states that she examined inmate Edgar Munera on March 27, 2002, following the incident at Bascom Palmer Eye Institute, and she did not see any signs of injury. Da Silva states that she completed a medical addendum form, a true and correct copy of which is attached to her affidavit as an appendix. [Da Silva Affidavit, ¶ 3]. The medical form attached to Da Silva's Affidavit, dated 3/27/02, is signed by her, and contains her notation, "No visible injuries noted" [Appendix to Affidavit].

### Affidavit of Tiffany Johnson

In her Affidavit [DE# 26, at pp. 11–13], Optimetric Technician, Tiffany Johnson, states that her review of Bascom Palmer Eye Institute records pertaining to Edgar Munera shows that Munera was seen four times in 2002, between February and December of 2002. Johnson states that "The records reflect that no surgery was performed on Mr. Munera's eyes during this time period, nor was any scheduled." [Johnson Affidavit, at ¶¶ 2–3]. Munera was seen on February 27, 2002 (just a month before the appointment that is the subject of this lawsuit). During this visit Munera complained that his vision had worsened over three years, and he said that he had experienced some itching in his eyes. At the time of the February exam there was no redness in his eyes, no discharge, no disturbed vision, and Munera's eyes were comfortable. His visual acuity was measured as 20/25 on the right, and 20/40 on the left, which is considered normal. Standard optimetric tests were performed, and the results were within normal limits. A slight discoloration or cloudiness was noted in both eyes. For that reason testing was performed to rule out glaucoma, and the test results were within normal limits. Munera was given a prescription for eyeglasses, and was scheduled for a follow-up examination on March 27, 2002. [Johnson Affidavit, ¶ 4].

The records for the March 27, 2002 visit indicate that there was no change in symptoms since the prior exam, and it was noted at the time of the examination that Munera was "not completely coherent." Staff repeated the same battery of tests which were conducted during the February appointment, but photography of the retina was not done. The results of the March testing were again found to be normal, including the results of the visual field test and the interocular pressure check,

which are used to detect glaucoma. [Johnson Affidavit, ¶¶ 5–6]. The March 27, 2002 records include a note that Munera left early because "security guard said he was 'too great a risk' to wait." The Bascom Palmer staff recommended that Munera return to the clinic at a later time for follow-up examination, to repeat the visual filed test and interocular pressure check. [*Id.*, ¶ 7].

Records for a follow-up examination on October 25, 2002, indicate that Munera complained of pain and redness in his eyes. Bascom Palmer staff repeated the same battery of tests that were performed during the February and March visits, and the results again were within normal limits. Munera was scheduled for a follow-up visit on December 16, 2002, in order to repeat the visual field test. [Johnson Affidavit, ¶ 8].

Records for the December 16, 2002 follow-up visit show that Munera complained of pain in the temporal region of his head, for which he was given Tylenol. No changes in symptomology were noted since the October 2002 visit; Munera was again given the visual field test and interocular pressure test, and the results were within normal limits. [Johnson Affidavit, ¶ 9].

Johnson states in her affidavit that the testing between February 27 and December 16, 2002, showed that Munera's eyes were healthy. Because cloudiness was noted during the February examination, staff monitored Munera for signs of glaucoma, but his repeated test results were consistently within normal limits. Johnson further states that if Munera had, in fact, suffered from acute glaucoma, it is likely he would have become blind within three days and required surgery. However, no change in his vision occurred between February and December of 2002. [Johnson Affidavit, ¶ 10].

A. *The Uses of Force*

■ It is well settled that detainees not convicted can sue for acts of violence by prison/jail officials. *See: Johnson v. Glick,* 481 F.2d 1028, 1033 (2 Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) [§ 1983 action; state detainee's claim measured in opinion by Judge Friendly under standard balancing 1) the need for application of the force, 2) the relationship between the need and the amount of force that was used, 3) the extent of the injury inflicted, and 4) whether force was applied in a good faith effort to maintain or restore discipline or "maliciously and sadistically for the very purpose of causing harm."]; *H.C. By Hewett v. Jarrard,* 786 F.2d 1080 (11 Cir.1986) [§ 1983 action; juvenile state pretrial detainee]; *Telfair v. Gilberg,* 868 F.Supp. 1396 (S.D.Ga.1994) [§ 1983 action; adult state pretrial detainee].

■ When a plaintiff was a pretrial detainee at the time of the events alleged in his complaint, and not a convicted prisoner, his claims which would lie under the Eighth Amendment prohibition against cruel and unusual punishment if he had been a convicted prisoner, arise instead from the Due Process Clause of the Fourteenth Amendment. *See: Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11 Cir.1985); *Redman v. County of San Diego,* 896 F.2d 362, 364–66 (9 Cir.1990); *H.C. By Hewett v. Jarrard, supra;* and *Telfair v. Gilberg, supra.*

Courts have diverged on the question of the precise standard that is to be used to review Fourteenth Amendment excessive use of force claims by detainees in general. *See: Wilson v. Williams,* 83 F.3d 870, 874–77 (7 Cir.1996), and cases cited therein.

In 1986, the Eleventh Circuit in *H.C. By Hewett, supra,* observing that the Due

Process Clause of the Fourteenth Amendment forbids punishment of pretrial detainees, applied Judge Friendly's four part substantive due process analysis from *Johnson v. Glick, supra,* to a claim that a battery committed by the Superintendent at a Florida HRS juvenile detention center violated the detainee's constitutional rights. *H.C. By Hewett, supra,* at 1085. The Eleventh Circuit also has applied the same standard (the four part Friendly analysis) in other contexts where the use of excessive force was alleged, for example, *O'Neal v. DeKalb County,* 850 F.2d 653, 654–55 (11 Cir.1988), a § 1983 action under the Fourteenth and Fourth Amendments against two policemen involved in shooting incident.

More recently, in 1994, in a case involving a claim of excessive force against a state pretrial detainee, a Court from this Circuit, the District Court for the Southern District of Georgia, engaged in a lengthy analysis of the distinctions between claims of excessive force raised by convicted prisoners, and similar claims by persons merely detained. The Georgia District Court suggested that an intermediate "revised standard" might be applied to a pretrial detainee's Fourteenth Amendment claim of excessive force. Under the proposed revised standard most of Judge Friendly's requirements in *Johnson* would be retained, except that which requires a showing of "malicious or sadistic intent." The proposed "revised" test would in the Court's words allow "proof under a lower, circumstantial standard." Under this "revised" standard the court would first search for evidence of intent to punish the detainee. Then, if there is no direct evidence of intent, the court would determine 1) whether a legitimate interest in the use of force is evident from the circumstances, and 2) if so, whether the force used was necessary to further that interest. *Telfair v. Gilberg,* 868 F.Supp. 1396, 1404–1412 (S.D.Ga.1994).

In this case, the sworn statements by defendant White in his own Affidavit (DE# 26, at pp. 3–7) show it was necessary to restrain Munera, a jail detainee facing state criminal charges. To accommodate Munera's medical needs it was necessary to take him to a medical facility where he would be in contact with the public. The force used initially was wrist restraints, with Munera seated in a wheelchair, but not shackled to the chair. This was for security purposes; and also was required by Corrections Department policy, promulgated to protect the public under circumstances that inmates were transported in and around the medical facility for examination or treatment. Officer White used the restraints because it was necessary; and to comply with departmental policy. Munera complained that his restraints were causing him discomfort. White addressed the problem by checking that the cuffs had been properly applied. He determined that they were not too tight. The design of the cuffs was such that they could not get tighter on their own. Munera's wrists were cuffed and restrained by a waist chain, designed to keep them close to his body. White determined that the cause for Munera's discomfort was that he was trying to move his arms, causing his wrists to pull against the cuffs. More than once he told Munera not to struggle or move his arms away from his body, and he would be comfortable. Due to Officer White's need to maintain security, and to comply with departmental policy, it was not an option for him to remove Munera's restraints; and there was no need to loosen the cuffs, which White had determined were properly adjusted.

The same is true with regard to the other uses of force by White against Munera. When Munera appeared in White's judgment and experience to have become agitated, and was exhibiting strange be-

havior by repeatedly moving from his wheelchair, to a seat by the window, and back, White made a judgment call and to maintain security of the members of the public who were present in the same room with Munera, and used additional minimal force, by pulling Munera back into the wheelchair and then adding additional restraints so that Munera's arms were chained to the arms of the wheelchair.

A physical examination of Munera by Nurse Da Silva at the hospital, within one hour of these events, revealed that he had suffered no injuries due to the force applied by Officer White.

■ Munera has attached a copy of an internal affairs report, summarizing his statements during an internal affairs investigation that was conducted after he filed a grievance against Officer White. The document is not a transcript of a statement given under penalty of perjury. It, Munera's unsworn response to White's motion for summary judgment, and Munera's unsworn cross-motion for summary judgment, merely serve to reiterate allegations made by him in his complaint, i.e., that the force used was unreasonable and applied with deliberate indifference. Officer White's sworn evidence indicates that it was not. Munera, as a *pro se* litigant, cannot merely rest on the allegations of his complaint, *Brown v. Crawford, supra,* and is required to respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial. *Fed.R.Civ.P.* 56(e); *Coleman v. Smith, supra; Brown v. Shinbaum, supra.* Munera has not done so by submitting significantly probative evidence to create a genuine issue as to material fact. *Anderson v. Liberty Lobby, Inc., supra; Baldwin County, Alabama v. Purcell Corp., supra.*

Under other circumstances, i.e., if the evidence had suggested uses of force by Officer White that were constitutionally impermissible (e.g. if there were medical documents showing injury, inconsistent with reasonable force, or other evidence such as sworn statements from witnesses), then Munera's allegations that Officer White verbally abused with profanity and statements about his ethnicity near to the time that that force was applied would become a factor in determining whether the force used was applied in good faith. Here, White's evidence indicates that the force was applied, in the minimal amount necessary under the circumstances, to maintain security.

Thus, under either the standard emanating from *Johnson v. Glick,* as articulated in Eleventh Circuit cases (*see: H.C. By Hewett*), or the "revised standard" proposed by the Southern District of Georgia in *Telfair,* it is apparent, with regard to plaintiff Munera's use of force claims, that the defendant Correctional Officer, Cyril White, is entitled to qualified immunity with respect to his actions toward the plaintiff on March 27, 2002; that there exist no genuine issues of material fact, *Celotex Corp. v. Catrett, supra,* and that summary judgment on the use of force claim in White's favor is appropriate.

### B. *Verbal Abuse and Threats*

■ Verbal abuse and threats alone are not actionable as a matter of law. *Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8 Cir.1992) (Racial slur); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9 Cir.1987) (Vulgar language); *Burton v. Livingston,* 791 F.2d 97 (8 Cir.1986) (Racial slur); *McFadden v. Lucas,* 713 F.2d 143, 146 (5 Cir.), *cert. denied,* 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983) (Threatening language and gestures); *Gilson v. Cox,* 711 F.Supp. 354, 355 (E.D.Mich.1989) (Cursing and verbal abuse). An exception to the general rule is that if a person is terrorized by threats accompanied by racial slurs, the conduct may rise to the level of a

brutal and wanton act of cruelty actionable under § 1983. *Hopson v. Fredericksen,* 961 F.2d 1374, 1378–79 (8 Cir.1992); *Burton v. Livingston,* 791 F.2d 97 (8 Cir.1986).

Officer White has not addressed Munera's allegations that White subjected him to profanity and ethnic slurs, however, such verbal abuse alone, while certainly inappropriate, unprofessional, and offensive if it were true, does not make a constitutional claim. White, with sworn evidence (his own Affidavit), has rebutted Munera's allegation that he threatened Munera with his weapon. Munera has not submitted sworn, probative evidence to rebut Officer White's showing that he did not threaten to shoot Munera, as alleged in the complaint. As to this claim Munera cannot merely stand on the allegations of his complaint, at the stage of summary judgment.

Under the circumstances, and the evidence of record, it is apparent that the alleged verbal abuse, if true, did not rise to the level of a constitutional tort; and as to the alleged threat of violence with a weapon against the plaintiff who was in restraints, there is no genuine issue as to material fact, *Celotex, supra,* and the defendant officer is entitled to qualified immunity, and summary disposition of the claim in his favor.

### C. *Denial of Access to Medical Care*

Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. Jail officials violate a pretrial detainee's Constitutional rights under the Fourteenth Amendment if they withhold appropriate medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Negligence is not enough, *Estelle, supra,* at 104–06, 97 S.Ct. 285. To prevail on such a claim, the detainee must establish: 1) an "objectively serious deprivation," i.e.

a serious medical need accompanied by a substantial risk of serious harm if unattended; 2) a response by public officials beyond negligence, i.e., one that is so inadequate as to constitute and "unnecessary and wanton infliction of pain;" and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, and that they actually did draw that inference. *Taylor v. Adams,* 221 F.3d 1254, 1258 (11 Cir.2000). The standard may be met where there is a showing that jail officials denied or delayed an inmate from receiving necessary medical treatment for nonmedical reasons, *see Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11 Cir.1985). In addition, officials' inordinate delay in providing necessary treatment, without medical explanation, may evidence deliberate indifference, *Farrow v. West,* 320 F.3d 1235, 1247 (11 Cir.2003), and the standard may be met where there is intentional, unexplained delay in providing access treatment for serious painful injuries, *Brown v. Hughes,* 894 F.2d 1533 (11 Cir. 1990), and cases cited therein.

In this case, initial screening of the plaintiff's *pro se* complaint suggested, based on his allegations, that Officer White's decision to remove him from the Bascom Palmer clinic on March 27, 2002, might have deprived him of needed medical care, including eye surgery. The plaintiff's allegations were sufficient for the claim to survive a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6). With further development of the record upon the filing of the parties motions for summary judgment, however, it has become apparent, based on undisputed facts established through the affidavit of Tiffany Johnson, that the plaintiff was not scheduled for surgery on March 27, 2002, when he was in Officer White's custody. Moreover, on

that date, Munera was having a follow-up appointment, most importantly to repeat tests conducted a in February 2002, to ensure that Munera was not developing glaucoma. Cloudiness noted in Munera's eyes in February raised the concern, but tests for glaucoma conducted during the February examination were negative (i.e., within normal limits). The sworn Affidavit of Tiffany Johnson indicates that removal of Munera by Officer White from the clinic on March 27, 2002, did not prevent Munera from having glaucoma testing conducted. Johnson's affidavit states that before Munera was removed due to security concerns, the visual field test and pressure check for glaucoma were completed, and resulted again in normal readings.

The removal of Munera from the clinic was clearly based on Officer White's security concerns, and in light of the fact that during the March 27 appointment Munera was tested by the eye clinic's medical staff for glaucoma, before he was taken away, it cannot be said that Officer White's action was deliberately indifferent to Munera's serious medical needs, or that he deprived Munera to medical care. Certainly, if the Bascom Palmer medical staff felt, based on Munera's symptoms, and test results, that another appointment was medically required prior to October 2002, it could have been arranged. Such scheduling, however, is not the duty of a security officer such as defendant White. Finally, it is clear from the results of Munera's tests in February, March, October, and December of 2002, that he was not going blind, as he has alleged. His visual acuity as measured in February 2002 was not 20/20, but he was prescribed glasses to correct his 20/25 and 20/40 vision.

Munera has not submitted evidence rebutting Officer White's showing that there is no genuine issue as to material fact with regard to the "access to medical care" claim, with documents showing that he was going blind, was denied surgery, or denied access to medical staff and examination by them on March 27, 2002, as a result of Officer White's decision. Under these circumstances, it is clear that defendant White was not deliberately indifferent to Munera's serious medical needs, *Estelle v. Gamble, supra,* and did not deny him access to or cause delay in access to necessary medical evaluation or treatment, *Farrow v. West, supra; Brown v. Hughes, supra.*

Under the circumstances, it is apparent, in the absence of a genuine issue as to material fact on the claim of denial of medical care, *Celotex, supra,* that the defendant White is entitled to qualified immunity with respect to his removal of Munera from the medical clinic on March 27, 2002, and that White is entitled to summary disposition of this claim in his favor.

### III. *Conclusion*

It is therefore recommended that: 1) the defendant White's motion for summary judgment (DE# 30) be granted; 2) the plaintiff Munera's motion for summary judgment (DE# 31) be denied; and 3) this case be closed.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.